**APPALACHIAN ELECTRIC POWER COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

No. 6835.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 15, 1954.

Decided Jan. 5, 1955.

Raymond T. Jackson, Cleveland, Ohio (Alexander H. Hadden and Herbert B. Cohn, Cleveland, Ohio, on brief), for petitioner.

Howard E. Wahrenbrock, Asst. Gen. Counsel, Federal Power Commission, Washington, D. C. (Willard W. Gatchell, General Counsel, Theodore French, Washington, D. C., and Mary E. Burke, Attorneys, Federal Power Commission, on brief), for respondent.

Before PARKER, Chief Judge, DOBIE, Circuit Judge, and THOMSEN, District Judge.

PARKER, Chief Judge.

This is a petition to review and set aside an order of the Federal Power Commission which directed the Appalachian Electric Power Company to eliminate items aggregating $524,002.47, representing litigation expense, from a statement of legitimate original cost, filed under section 4(b) of the Federal Power Act, 16 U.S.C.A. § 797(b). The statement, which contained items aggregating $10,229,708.74, represented ex-

penditures made in connection with the creation of a power project in the New River near Radford, Virginia. No other items in the statement were contested. The contested items represented expenses incurred in litigation which involved the necessity of obtaining a license under the Federal Power Act, 16 U.S.C.A. § 791a et seq. That litigation was before the Federal Power Commission, the United States District Court for the Western District of Virginia, this court and the Supreme Court of the United States. See Appalachian Electric Power Co. v. Smith, D.C., 4 F.Supp. 3, 6, Id., 4 Cir., 67 F.2d 451, certiorari denied 291 U.S. 674, 54 S.Ct. 458, 78 L.Ed. 1063, and United States v. Appalachian Electric Power Co., D.C., 23 F.Supp. 83, Id., 4 Cir., 107 F.2d 769, Id., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243.

There is no dispute as to the facts, as to the company's good faith in resorting to the litigation or as to the reasonableness of the legal expenses incurred. The litigation expenses were ordered stricken by the Commission from the statement of legitimate cost on the ground that the litigation contributed nothing to the project but was an attempt, which failed, to avoid the necessity of taking a federal license. The Commission recognized that the expenditures were properly made by the company in connection with the physical project which it was engaged in building, but refused to allow them to be incorporated along with the other costs of that project on the theory that the physical project was to be distinguished in some way from the project as licensed. The rationale of the Commission's decision is contained in the following paragraph of its report:

"Such costs were costs of attempting to achieve an objective which was never realized. That objective was to bring into being and operate the physical project which was actually constructed, but to do so without its being subject to a standard license, so it could be operated free from the restrictions of the rate and

recapture provisions, based on actual legitimate original cost, which the Act makes mandatory for standard licenses. We assume that that objective, if realized, would have produced benefits to the company and its investors not produced by the licensed project. Those benefits were the object for which the company carried on the litigation, made these expenditures. But even if we assume, arguendo (and we do not pass on this question), that if the litigation had succeeded and as a result the objective had been realized, and that these costs might for some purposes be deemed to be properly capitalizable as costs of accomplishing that objective, it does not follow that the expenditures are capitalizable as cost of the *licensed* project we have to consider. The licensed project presumably cannot produce the benefits to the company and its investors for which the expenditures were made. The expenditures contributed nothing to the licensed project, to its capability, its productivity, or its profitableness."

That this was the sole basis of the decision is emphasized in the order denying the petition for rehearing, wherein the Commission said:

"As we sought to make clear in our order issued February 11, 1954, the expenditures for the New River litigation were incurred in an effort to benefit the ownership of the project by enabling it to construct, maintain, and operate the project without a license; they did not benefit, contribute anything to, or in any way enter into, the construction, operation or maintenance of the licensed project, which was in fact brought into existence. Where that is true they cannot be capitalized as cost of that project."

The question thus presented is a pure question of law, i. e. whether under the statute and the uncontroverted facts, the Commission was justified in excluding litigation expense reasonably incurred

by the owners in securing a determination of the question as to whether a federal license was required for the project. In other words, was the company entitled to treat litigation expense incurred in defending its right to develop its property in accordance with its own ideas, and against an asserted servitude, as a part of the cost of the property and hence a part of legitimate cost of the project, or must such expense be treated as a loss and as such charged against the earned surplus of the company? We think that the company was clearly entitled to treat it as a part of legitimate cost. Not only was it an expenditure to protect the property against a servitude being asserted against it, which was of doubtful validity, but it was an expenditure for litigation which was necessary to determine the status of the property with respect to conflicting rights of regulation by the state and federal governments. This becomes abundantly clear when consideration is given to the facts with respect to the acquisition of the property, the dispute as to the navigability of New River, and the history of the litigation in which the expenditures were made.

The property on which the dam was built was acquired for the development of water power by the New River Development Company, a corporate predecessor of the Appalachian Electric Power Co., long prior to the passage of the Federal Water Power Act of 1920. The development of the project began about the year 1908, when the New River Development Company began the purchase of land for water power purposes, and by 1925 a considerable amount, estimated at between half and three quarters of a million dollars had been invested in the property. The Federal Water Power Act of 1920 provided for the licensing by the Commission of water power projects in navigable streams or where the operation of such projects would affect the navigable capacity of any navigable waters of the United States. 16 U.S.C.A. § 797(e). Although the New River Development Company denied that New River was a navigable stream or that the Radford project would affect the navigable capacity of any stream that was navigable, it filed with the Commission on June 25, 1925, a declaration of intention to construct the project, as allowed by section 23 of the Act, 16 U.S. C.A. § 817, in the hope that the Commission would disclaim any jurisdiction in the premises and that this would aid in the financing of the project. Shortly thereafter, the Appalachian Electric Power Company, the petitioner here, acquired the investment that had been made in the project as the result of a corporate consolidation together with all rights under the declaration of intention filed on June 25. The Commission requested a report of the Chief of Army Engineers, who first reported that the New River was navigable but later filed a report finding that in its present condition it was not navigable and that navigation on the Kanawha, the only navigable stream which it was thought might be affected by the project, would not be affected by it.

The Commission held a hearing on the matter on March 2, 1926, at which the only evidence offered was the report of the Chief of Engineers. Sometime later, the company filed an application for a license on the Commission's suggestion that this would expedite matters and could be withdrawn if it later developed that no license was required. In October of 1926 the district engineer of the War Department held a hearing with respect to the matter. On June 1, 1927, the Commission made a finding that the New River was not "navigable waters" within the definition of section 3 of the Federal Power Act of 1920, 16 U.S.C.A. § 796, but that the project would affect the interests of interstate and foreign commerce within the meaning of section 23 of the Act. On July 1, 1927, the Commission tendered a standard form license, which the company refused, in April 1928, principally on the ground that the conditions—especially those concerning rates, accounts and eventual acquisition—were unrelated to navigation.

The action of the company in refusing a standard form license in 1928 was taken after it had sought and obtained the advice of Hon. Charles E. Hughes, who at that time was engaged in the practice of law, to the effect that the Commission was without power to require of the company a standard form license and that the most that could be required of it was a minor part license under section 10(i) of the Act, 16 U.S. C.A. § 803(i), conditioned upon the operation of the project in such way as not to interfere with the navigability of the Kanawha. By this time, officers of the State of Virginia were manifesting an interest in the matter and were asserting that, as the New River was not navigable, the right of regulation was in the State of Virginia, and not in the federal government, and that the requirement of a license of the company imposing any condition other than not to interfere with navigation by the operation of the project would constitute an infringement upon the sovereignty of the state. The questions thus raised as to jurisdiction, coupled with doubts as to the economic feasibility of the project if a license should be required, caused the company to refrain from going forward with construction at that time.

In February, 1930, respondent reiterated that its project was not within the Commission's jurisdiction, but nevertheless offered to accept a "minor-part" license containing only such conditions as would protect the interest of the United States in navigation. In September, 1930, on a question submitted by the Commission stating that the New River was neither navigated nor navigable in fact, Attorney General Mitchell advised the Commission that it could properly issue such a minor-part license. On November 25, the Commission "declined to take action on the application favorable or adverse", on the ground that a court adjudication was desirable. After the establishment of the Commission as an independent agency, it held another hearing in February, 1931 and in April denied the application for a minor-part license, directed that the respondent be tendered a standard form license under the Act, and ordered it not to proceed without such a license. A minority of the Commission then favored a finding that the New River was navigable; the majority, however, thought that that question was for the courts and that the Commission's jurisdiction was properly based, under section 23 of the Act, on the effect that the project would have on commerce.

At the time of entering the order of April 1931, members of the Commission had indicated to officials of the company that it was desirable that the questions which had been raised as to the power of the Commission to require the license be settled by court decision; and the company accordingly instituted the first of the suits above mentioned against the members of the Commission which was ordered dismissed by this court for lack of jurisdiction, 67 F.2d 451, and the Supreme Court denied certiorari on February 19, 1934. 291 U.S. 674, 54 S.Ct. 458, 78 L.Ed. 1063. In order to obtain a judicial decision on the questions involved, the company, thereupon, notified the Commission that it would proceed with the project without obtaining a license and began token construction as the basis for a suit by the government, which was commenced shortly thereafter and is the second suit referred to above. This suit was decided against the contentions of the government in the District Court and by a majority of this court, over the dissent of the writer of this opinion; but the position of the government was sustained in the Supreme Court, with Chief Justice Hughes abstaining and two of the justices dissenting, on the ground that New River was navigable and that a standard license could be required as a condition of the construction of the project. That decision was rendered in 1940. In the meantime the company, as a result of changed economic conditions, had gone forward with the project and it was put in commercial operation a short time before the litigation was ended.

Under the circumstances, which we have thus narrated at some length, we think there can be no question but that the proper expenses of the litigation should be treated, not as a general loss chargeable against earned surplus, but as an expense incurred in defending and perfecting the title to property necessary to the development of the project. The fact that the litigation was not successful is no reason for not capitalizing its necessary cost as a part of the cost to the company of the property involved. The government was asserting rights with respect to the property which, if sustained, would greatly impair its value. The company had the best of reasons for thinking that these rights were not well founded. In addition to the report of the Chief of Engineers that New River was not navigable, it had the opinion of one of the greatest lawyers of the country that the company could not be required to take the standard form license to which it was objecting and knew that the Attorney General of the United States had given an opinion that, upon the facts stated by the Commission, the United States had no power to prevent the construction of the proposed project unless its operation would tend to impair the navigability of the Kanawha and for that reason had recommended the issuance of a minor part license. In addition to this, the State of Virginia was asserting conflicting rights. In this posture of affairs it was not only wise but necessary that a court decision be obtained to set these questions at rest; and there is no reason why the cost of such proceedings should not be treated as a part of the cost of the property to which they related. It is no answer to say, as does the Commission, that the litigation was for the purpose of avoiding a license and that the only cost allowed by the statute is the cost of a licensed project. The litigation was unquestionably undertaken for the benefit of the project which was ultimately licensed, and the costs of that litigation were a part of the legitimate costs of bringing that project into being. Any business man would so regard them, any purchaser of the project would so regard them and there is nothing in the statute which requires that they be treated in any other manner. In the applicable section of the Act, 4(b) 16 U.S.C.A. § 797(b), the Commission is authorized and empowered:

"(b) To determine the actual legitimate original cost of and the net investment in a licensed project, and to aid the Commission in such determinations, each licensee shall, upon oath, within a reasonable period of time to be fixed by the Commission, after the construction of the original project or any addition thereto or betterment thereof, file with the Commission in such detail as the Commission may require, a statement in duplicate showing the actual legitimate original cost of construction of such project, addition, or betterment, and of the price paid for water rights, rights-of-way, lands, or interest in lands."

"Net investment" as used in the foregoing section is defined in section 3(13) of the Act, 16 U.S.C.A. § 796(13), by reference to classification under the Interstate Commerce Act, as follows:

"(13) 'net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission', * * *. The term 'cost' shall include, insofar as applicable, the elements thereof prescribed in said classification, but shall not include expenditures from funds obtained through donations by States, municipalities, individuals, or others, and said classification of investment of the Interstate Commerce Commission shall insofar as applicable be published and promulgated as a part of the rules and regulations of the Commission".

Pursuant to the statutory duty imposed upon it by the foregoing section, the Commission promulgated the I.C.C. classification as Appendix II to its official publication entitled "Uniform System of Accounts Prescribed for Public Utilities and Licensees" and under the heading "Applicability of System of Accounts", stated: "In accordance with the requirements of section 3 of the act, the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission,' is published and promulgated as a part of the accounting rules and regulations of the Commission, and a copy thereof is appended hereto as Appendix II. Irrespective of any rules and regulations contained in this system of accounts, the cost of original projects licensed under the act, * * * shall be determined under the rules and principles as defined and interpreted in said classification of the Interstate Commerce Commission so far as applicable."

In the general instructions at the beginning of the I.C.C. classification under the heading "Items to be Charged" it is stated "Construction includes *all processes connected with* the acquisition and construction of original road and equipment, road extensions, additions, and betterments". (Italics supplied.) Elements of cost prescribed in relevant accounts of the I.C.C. classification include under the heading "General Expenditures" an item as follows: "73. *Law*. This account shall include specific and distinct expenditures not provided for elsewhere, for law service *in connection with* the acquisition of new road, road extensions, additions, and betterments, such as pay and expenses of counsel, solicitors, and attorneys, their clerks and attendants, and expenses of their offices." (Italics supplied.) Item 77 is as follows: "77. Other Expenditures—General. This account shall include all expenditures of a special and incidental nature in connection with the acquisition and construction of original road * * * which cannot properly

be included in any other account in this classification".

The expenditures here in question were unquestionably made in connection with the construction of the Radford dam and fall within the letter as well as the spirit of these regulations. They were made, not with respect to any other property or project, but with respect to this property alone; and they were made not only in an attempt to free the property from a servitude asserted by officers of the government which would greatly decrease its value as a water power project, but also for the purpose of settling a controversy which had arisen as to conflicting rights of the state and federal governments to control and regulate the project being constructed. This seems so clear that we think that nothing would be gained by an analysis of decisions made by the Commission in somewhat analogous cases. It might be noted, however, that, in Lexington Water Power Company 1 F.P.C. 430, 454, 477, cost of unexercised options and of a legal opinion as to the applicability of the Federal Water Power Act were held to be proper elements of costs. In Safe Harbor W. P. Corp. 1 F.P.C. 367, 369–370, loss on sale of lands purchased for quarrying operations but not used on the project were held proper. In Southern Industries & Utilities, Inc. 1 F.P.C. 219, 226, legal fees to protect the company's rights before Congress, the War Department, the T.V.A., the Commission and the courts were held proper. In Susquehanna P. Co. 4 F.P.C. 74, 113, 125, $170,000 for legal services in presenting a proposed corporate structure to state commissions was sustained, as was the cost of an experimental and abandoned communications system. In Puget Sound P. & L. Co. 3 F.P.C. 231, 242, loss sustained as a result of a bank failure was held proper. In Minnesota Power & Light Co. 7 F.P.C. 98, 9 F.P.C. 472, expenditures, including legal fees, in connection with reinforcing railroad bridge piers, for which it later turned out the licensee was not liable, were held

proper. If the legal services here had been rendered in unsuccessful litigation with an upstream power plant with respect to the height of the company's dam, no one would contend, we think, that the expense would not be chargeable against the project as a capital expenditure, even though it resulted in no contribution to construction, operation or maintenance. It can make no difference that the unsuccessful services were rendered in a contest with the government rather than with a private individual.

The Commission stresses the case of Pennsylvania P. & L. Co. 3 F.P.C. 89, 116–117, affirmed sub nom. Pennsylvania Power & Light Co. v. Federal Power Commission, 3 Cir., 139 F.2d 445, certiorari denied 321 U.S. 798, 64 S.Ct. 938, 88 L.Ed. 1086, in which one of the items disallowed was loss arising from the sale of surplus flow line bands and shoes bought for the project but not used as result of mistake in construction. Without passing upon the question there involved, we think it is perfectly clear that the decision there throws little light on the question here, where we are dealing with legal services which related to the project as constructed and which were necessary to a defense of the property against an asserted servitude reasonably thought not to be justified and necessary also to secure judicial determination of questions, vital to the construction of the project, as to conflicting rights of control as between the state and federal governments.

The Commission relies also upon the case of Pennsylvania W. & P. Co. 8 F.P.C. 1, 53–54, affirmed sub nom. Pennsylvania Water & Power Co. v. Federal Power Commission, 89 U.S.App.D.C. 235, 193 F.2d 230, 243, Id., 343 U.S. 414, 72 S.Ct. 843, 96 L.Ed. 1042, in which certain legal expenses were excluded in determining the rate base for rate making purposes. As said by the Court of Appeals, however, these were properly excluded from the rate base because they had already been recovered by investors in the form of operating expenses and depreciation reserve. Here, the expendi-

tures had not been recovered as operating expenses or otherwise. They were made during the process of construction and are properly considered as capital expenditures and not as cost of operation. A similar question arises with respect to the treatment of legal expenses in tax cases, where the rule is that if such expenses are incurred in developing or improving property, they constitute a part of the cost of the property and are not deductible as expenses. Garrett v. Crenshaw, 4 Cir., 196 F.2d 185; Bowers v. Lumpkin, 4 Cir., 140 F. 2d 927, 151 A.L.R. 1336; Bush Terminals Buildings Co. v. Commissioner of Internal Revenue, 2 Cir., 204 F.2d 575, certiorari denied 346 U.S. 856, 74 S.Ct. 72, 98 L.Ed. 370. If the company here had sought in its tax returns to deduct the costs of litigation here involved as a loss or as a current business expense, it would have been met with the answer that the amount so expended was not a loss but an investment in the project which the company was building. Such an answer would have been sound for the purposes of the taxing statutes. We think it equally sound for the purposes of the statutes here under consideration.

Argument is made that, since legitimate cost under the statute is computed as a basis for rate making or purchase by the public, expenditures made in the course of such litigation as was here involved should not be included. If, however, such expenses constitute, as they unquestionably do, a part of the cost of the project to the owner, there is no reason why they should not be included in cost for rate making, acquisition by the public or any other purpose. Of course, if they had been imprudently made or had not been made in good faith or had been excessive in amount, they should not be allowed; but they are not attacked on any of these grounds. On the contrary, the Commission concedes, as we understand, that they were prudent, proper and not excessive and that they would be capitalizable as a part of the cost of the project for all purposes except the purposes of the stat-

ute here under consideration. We think they are capitalizable for that purpose also. If the valuation should ever become important for the purposes of purchase or rate making it will be because the company's investment in the property is less than its fair value, for the lowest of these must be taken under the statute; and if rate making or purchase is to be based on investment in property which is lower than its fair value, it is but fair and honest that all of the investment which the owner has made in the property be considered.

For the reasons stated, the order directing the company to eliminate the litigation expenses amounting to $524,-002.47 from its statement of cost will be reversed and set aside and the company will be permitted to restore these expenses to its statement.

Reversed.