The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

Pacific Bell and Nevada Bell, Bell Atlantic Telephone Company, et al., New York Telephone Company and New England Telephone and Telegraph Company, North American Telecommunications Association, Bell South Corporation, Southern Bell Telephone Company and Telegraph Company, South Central Bell Telephone Company, American Telephone and Telegraph Company, North American Telecommunications Association, United States Telephone Association, GTE Service Corporation, Intervenors.

No. 89–1421.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1990.

Decided July 23, 1991.

Robert B. McKenna, for petitioners.

Laurel R. Bergold, Counsel, F.C.C., with whom Robert L. Pettit, General Counsel, and John E. Ingle, Deputy Associate General Counsel, F.C.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan and Robert Wiggers, Attorneys, Dept. of Justice, were on the brief, for respondents.

Alfred Winchell Whittaker, with whom Katherine C. Zeitlin and Martin T. McCue, for U.S. Telephone Ass'n, Mark J. Mathis, Thomas L. Welch and David K. Hall, for Bell Atlantic Telephone Companies, Gail L. Polivy, Richard McKenna, for GTE Service Corp., James B. Tuthill, M. Mates and Stanley J. Moore, for Pacific Bell, Nevada Bell, William B. Barfield and R. Frost Branon, for BellSouth Corp., et al., Mary McDermott and Donald W. Boecke, for New England Tele. & Tele. Co., and New York Telephone Co., Liam S. Coonan and James S. Golden for Southwestern Bell Corp. were on the joint brief, for intervenors.

Saul Fisher and Martin J. Silverman also entered appearances for intervenor, New England Tele. & Tele. Co., and New York Telephone Co.

Albert H. Kramer and Robert F. Aldrich entered appearances for intervenor, North American Telecommunications Ass'n.

William C. Sullivan, Patricia J. Nobles and Richard C. Hartgrove also entered appearances for intervenor, Southwestern Bell Telephone Co.

Francine J. Berry and Mark E. Manly entered appearances for intervenor, American Tele. & Tele. Co.

Daniel L. Bart also entered an appearance for intervenor, GTE Service Corp.

Before EDWARDS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Several telephone companies petition for review of a Federal Communications Commission decision, known as the *USOA Antitrust Costs Order*, that places upon them the burden of showing that they should recover from ratepayers the costs of adverse judgments, settlements, and litigation expenses arising from certain types of lawsuits. Because the FCC did not adequately justify the scope of the rule, and did not sufficiently consider its probable effects upon the companies' incentives, we grant the petition and remand the matter for the Commission's further consideration.

## I. Background

Section 201(b) of the Communications Act of 1934, 47 U.S.C. § 201(b), requires that rates for interstate telephone service be just and reasonable. The FCC tries to enforce that requirement, as do most utility regulators, via so-called "rate of return" regulation: a carrier's rates are deemed just and reasonable if they are set at a level expected to produce no more than its "revenue requirement," that is, its allowable expenses plus a reasonable return on its invested capital. *See* T. Morgan, J. Harrison, & P. Verkuil, *Economic Regulation of Business* 223 (1985).

In furtherance of this regulatory scheme, the FCC has "prescribe[d] the forms of ... accounts" for regulated carriers. 47 U.S.C. § 220(a). For the purposes of this proceeding, all one need know of the FCC's Uniform System of Accounts [USOA] is that an expenditure in an account "above the line" may presumptively be included in, and an expenditure allocated to an account "below the line" is presumptively excluded from, the carrier's revenue requirement. *See American Telephone and Telegraph*, 98 F.C.C.2d 982, 985–86 (1984); *Proposed Amendments to Uniform System of Accounts* (CC Docket No. 85–64), Notice of Proposed Rulemaking, FCC 85–120 at 1 n. 1 (May 3, 1985).

Historically, the FCC has allowed carriers to record their litigation expenses and damage judgments above the line, *see* 47 CFR §§ 31.664, 31.669 (1985), although "[p]enalties and fines paid on account of violations of statutes" were placed below the line, in an account for "nonrecurring transactions that are not customary business activities," *see* 47 CFR § 31.370 (1985). In 1979, the FCC considered changing these rules, but after nearly four years of consideration concluded that they provided ratepayers with "adequate protection against unreasonable litigation spending." *See Litigation Expenses*, Notice of Inquiry, 70 F.C.C.2d 1961 (1979); *Litigation Expenses*, Memorandum Opinion and Order, 92 F.C.C.2d 140, 146–47 (1982).

Shortly thereafter, when an antitrust judgment for almost $277 million was entered against AT & T, *see Litton Systems, Inc. v. American Telephone and Telegraph*, 700 F.2d 785 (2d Cir.1983); *AT & T*, 3 FCC Rcd 500, 500 (1988), the Commission revisited the subject. Concluding that "violating a statute should [not] be regarded as a routine part of operating a business," the agency directed AT & T to enter the judgment and related litigation expenses below the line in the account for non-recurring transactions as a fine or penalty. *AT & T*, 98 F.C.C.2d at 984–85, *reconsideration denied*, 3 FCC Rcd 500, *vacated and remanded, Mountain States Telephone and Telegraph v. FCC*, 939 F.2d 1021 (D.C.Cir.1991).

Between the issuance of that order and the order denying its reconsideration, the FCC also initiated the rule-making under review here, announcing that:

> The policies and accounting classifications we adopt in this proceeding shall apply broadly to litigation costs, judgments and settlements emanating from alleged civil or criminal violations of any federal law, even though we focus on antitrust cases for the purposes of our analysis. We do not here address judgments and costs arising in the ordinary course of business out of contract disputes, tort liability for accidents, workman's compensation, and the like.

*Proposed Amendments to Uniform System of Accounts* (CC Docket No. 85–64), Notice of Proposed Rulemaking, FCC 85–120 at 3 (May 3, 1985) (*Notice*). Within the realm of federal law, though, it proposed that judgments and settlements be recorded below the line, *see id.* at 3–5, and requested comments on various possible methods of accounting for litigation expenses, *see id.* at 5–6.

After receiving comments, in 1987 the FCC adopted new accounting rules for the presumptive treatment of litigation expenses, settlements, and judgments (hereinafter called L, S & J costs) related to violations of federal law, pointing out that these rules did not purport to be "a final determination that judgments or other costs associated with a particular case should or should not be disallowed." *Re-*

*port and Order,* 2 FCC Rcd 3241, 3242 (hereinafter *USOA Antitrust Costs Order* or *Order*). Rather, the change meant "that the companies, not the Commission, [would] in the first instance need to provide evidence as to the reasonableness of including the costs which were incurred in connection with alleged violations of law in a revenue requirement that is used to compute charges paid by ratepayers." *Id.* at 3243.

The Order begins:

In our Notice ... we initiated an inquiry into the manner in which carriers should account for costs incurred in defending, settling and paying judgments in antitrust lawsuits, as well as suits alleging civil or criminal violation of any other federal law. (For convenience, all these types of suits will be referred to [in this Order] as "antitrust cases.")

2 FCC Rcd at 3241. Because the analysis in the Order focuses on antitrust considerations, this terminological equation makes it unclear whether certain references to "antitrust cases" are to be read literally or are instead meant to refer to "all federal cases."

Under the new rules, judgments in all federal statutory cases would henceforth be recorded below the line, *id.* at 3243–44, because they "result from violation of statutes which establish an important public policy." *Id.* at 3244. Apparently reverting to a literal use of antitrust terminology, the FCC noted in particular that, although the conduct giving rise to an "antitrust judgment" is "often the result of a corporate strategy that could benefit shareholders[,] ... such conduct rarely, if ever, produces any benefit for ratepayers"; hence, this type of expenditure should not appear above the line unless the carrier can show that the judgment is "the byproduct of activities that benefit ratepayers." *Id.*

Settlements were also to be recorded below the line. The FCC was not reluctant to apply this rule to a settlement reached after the entry of an initial judgment against the carrier, for example, while an appeal is pending: in such a case a judge or jury has determined that the company violated the law. *Id.* at 3245. The agency explained, however, that it had decided to place pre-judgment settlements below the line as well, in order to avoid giving carriers too great an incentive to settle cases rather than risk an adverse judgment, and to avoid giving plaintiffs an incentive to bring frivolous cases in the hope of coercing a settlement before judgment, i.e., while the carrier presumptively could still pass the cost along to ratepayers. *Id.* at 3245.

The FCC decided to let carriers continue to record litigation expenses above the line during the pendency of the litigation, because mandating below-the-line accounting would "create[ ] an unfair presumption of impropriety, appear[ ] to violate [the FCC's] neutrality in ongoing private court disputes, and [be] administratively burdensome." *Id.* at 3246. Nevertheless, the agency said, it could not allow carriers "to avoid the financial consequences of their unlawful actions by passing those expenses to the ratepayers"; therefore, after a final adverse judgment or a post-judgment settlement, litigation expenses previously booked above the line would be moved below the line, to be "recaptured" in the next appropriate ratemaking proceeding. *Id.* at 3247. Litigation expenses in cases settled before judgment would remain above the line. *Id.*

Upon reconsideration, the FCC modified its position in one respect: a pre-judgment settlement would be "presumptively recoverable from ratepayers" to the extent of "the additional litigation expenses ... which the carrier reasonably estimates it would have paid if it had not settled and which the carrier would have allocated to the interstate jurisdiction." *Reconsideration Order,* 4 FCC Rcd 4092, 4097 (1989). (The amount of the litigation expenses thus avoided is hereinafter referred to as the "nuisance value" of the suit.) This modification, the FCC stated, would eliminate the incentive for a carrier to incur (presumptively recoverable) litigation costs in excess of the (presumptively non-recoverable) costs of settlement. *Id.* at 4098. The modification would not apply to post-judgment settlements, however: "The issuance of an

adverse judgment by a court should place a heavier burden on the carrier to show why ratepayers should bear any cost of a subsequent settlement payment." *Id.* at 4098.

The agency reaffirmed its view that the new rules, extending to all federal statutory violations, "balance the need to distinguish between violations that raise public policy implications and judgments that deal with local matters, such as tort actions, that any business may face in its day-to-day operations." *Id.* at 4094. It gave two additional reasons for applying the rules to litigation involving any federal statutory violation: first, that approach "provides a high degree of uniformity and certainty as to how judgments and settlements are recorded," and second, "[t]he record herein does not establish any other valid distinction for accounting purposes to justify a presumption of ratemaking allowance for certain types of federal law violations but no presumption for others." *Id.*

Three carriers filed a petition for review of these orders pursuant to the Hobbs Act, 28 U.S.C. § 2342(1), and many others intervened in their support. The FCC contends in limine that the court should dismiss the petition on the ground that the issues it raises are not ripe for review. We consider that contention before proceeding to the merits of the petition.

## II. RIPENESS

■ Whether a case is ripe for judicial review depends upon an evaluation of "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Association of American Railroads v. ICC*, 846 F.2d 1465, 1469 (D.C.Cir.1988) ("*ARR*"); *Eagle–Picher Industries v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985). The FCC contends both that the carriers have suffered no hardship, and that the issues they raise are not fit for judicial resolution.

Regarding fitness, the FCC claims that because it "has not disallowed any expenditures or even finally determined that they

will be disallowed," its new accounting rules for L, S & J costs do not "represent[ ] its final word on the subject," quoting *AAR*, 846 F.2d at 1469. By "the subject," the agency apparently means whether a particular carrier will be allowed to include a particular expenditure in calculating its revenue requirement. On that understanding of the subject at hand, the agency's point is accurate but not relevant. More practically, we see that the challenged orders presently alter accounting classifications and the prior presumption in favor of recoverability; they are the product of four years of consideration and study by the FCC through extensive notice and comment rulemaking proceedings, *cf. Eagle–Picher*, 759 F.2d at 917; and the FCC has not suggested, in the rulings themselves, or even in its effort to avoid our present review, that its views on these subjects are open to modification.

■ As we have noted elsewhere, when the Congress passed the Hobbs Act, which allows a petitioner 60 days within which to challenge an order of the FCC, *see* 28 U.S.C. § 2344, it determined that the agency's interest generally lies in prompt review of agency regulations. *See AAR*, 846 F.2d at 1469. We accord "heavy weight" to that view. *Eagle–Picher*, 759 F.2d at 916, 918 (similar statutory review provision of CERCLA). If the FCC were to identify any specific benefit to be had by deferring review in this case, we would of course consider that as well. But the agency points to no real gain from delay.

■ The FCC misses the point with its repeated assertion that "final resolution of any question of disallowance will turn upon factual matters, such as the nature of the litigation, the types of expenditures that are involved, and any claim of justification for allowing the expenditure"; so, too, with its argument that the court may decline review where its "deliberations might benefit from letting the question arise in some more concrete and final form," *State Farm Mutual Automobile Insurance Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986) (internal quotation marks omitted). The

carriers are making a facial challenge to the agency's across-the-board shift in the burden of proof, which does not depend upon consideration of such particularized facts. *See Chemical Waste Management, Inc. v. EPA*, 869 F.2d 1526, 1533 (D.C.Cir. 1989) (in determining that issues were ripe for review, court noted that agency's later decisions would not likely affect court's judgment on those issues); *United Church of Christ v. FCC*, 911 F.2d 813, 816–17 (D.C.Cir.1990) (FCC's refusal to adopt licensing policy ripe for review; petitioners need not wait until FCC grants a license they believe to be contra the public interest); *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 492 (D.C.Cir.1988). In light of the wholly legal and facial nature of the present challenge, we cannot agree that our ability to review the agency's decision would be increased by delay.

Nor are we impressed by the agency's observation that, if a "carrier rebuts the presumption of disallowance in a rate proceeding, judicial review can be avoided altogether." Considering the frequency with which federal statutory cases—antitrust, environmental, labor, occupational health and safety, etc. etc.—are brought against large corporations such as the petitioning carriers, as well as the FCC's own warning that it will be "difficult to rebut" the presumption created by recording an L, S & J expense below the line, *Order*, 2 FCC Rcd at 3257 n. 4, we think the issue is certain to come back to us. *Cf. Natural Resources Defense Council v. EPA*, 859 F.2d 156, 168 (D.C.Cir.1988). Indeed, it seems unlikely that the FCC would have undertaken to alter the presumptive treatment of L, S & J costs if it did not believe that doing so would have a significant effect upon the carriers' ability to recover substantial expenses from ratepayers. *See AAR*, 846 F.2d at 1469–70. In sum, the FCC has produced no specific reason for thinking that this case is not now fit for review.

Regarding hardship, the FCC argues that the orders in this case do not subject the carriers to any harm, again because "[t]he Commission has not determined finally that any expenditures ... will be disallowed for ratemaking purposes." The petitioners, on the other hand, claim that they would likely suffer three different types of hardship if review is delayed.

We question whether the burdens of assembling and presenting evidence to the FCC, and of the uncertainty the carriers face in planning litigation strategy until the rules are approved or disapproved, would constitute sufficient hardships to justify immediate review if there were strong institutional reasons for deferring review. *See Arkansas Power & Light v. ICC*, 725 F.2d 716, 726 (D.C.Cir.1984) (challenge to agency's policy statement explaining burden of proof and production not ripe: "[t]he only conceivable hardship might be in the effort of making a showing ... against a proposed rate that [petitioners] have voluntarily chosen to challenge"); *Diamond Shamrock Corp. v. Costle*, 580 F.2d 670, 673 n. 1 (D.C.Cir.1978) (effect of uncertainty on regulatee's ability to plan capital budget not sufficient hardship to render challenge to effluent regulations ripe: "petitioners ... need not expend any funds at this time since there is no administrative directive to which they must comply, nor ... do they face any sanctions for non-compliance"); *Natural Resources Defense Council*, 859 F.2d at 166. *But see South Carolina Electric & Gas v. ICC*, 734 F.2d 1541, 1545–46 (D.C.Cir.1984) (being required to maintain two sets of books for two different accounting systems may constitute present hardship) (dictum).

The carriers also point to one rather more concrete form of immediate hardship: the alteration in accounting presumptions precludes their establishing a reserve with respect to the costs of future judgments and settlements. As counsel for the FCC confirmed at oral argument, a carrier is not permitted to reserve against a below-the-line expense, recovery of which is presumptively to be disallowed. This is not, then, a case in which the carriers complain that their revenue requirement may be decreased when the agency applies the new presumptions at some time in the future; the carriers are being forced to forgo revenues now.

Moreover, without such reserves these revenues may be lost forever. The FCC has said that "[a]llowability [of L, S & J expenditures] will be finally determined only in a subsequent ratemaking proceeding," *Reconsideration Order*, 4 FCC Rcd at 4096; *see also Notice* at 1 n. 1, 5; *Order*, 2 FCC Rcd at 3242, 3244, 3246; *Reconsideration Order*, 4 FCC Rcd at 4092, 4097, 4098. This statement and the cited passages are ambiguous as to whether the FCC intends to allow a carrier who rebuts the presumption to "recapture" in the rates for one year the settlement and judgment expenses (plus interest) it incurred in a previous year. The FCC may intend only to increase the rates for the later period to the extent that allowable expenses are foreseeable on the basis of experience in the earlier period.

■ The FCC's brief is slightly more definite, stating that "the carriers will have the opportunity to explain to the Commission in [a rate proceeding] why the expenditures should be passed on to the ratepayers," but the brief cannot be used to substitute counsel's assurances for the perhaps studied ambiguity of the agency. We note also that for the FCC to allow a carrier to recoup expenses incurred in years prior to those for which rates are being set would be a departure from its fundamental ratemaking practice, and would raise serious questions regarding retroactive ratemaking, *see, e.g., Public Utilities Commission of State of California v. FERC*, 894 F.2d 1372, 1382–84 (D.C.Cir.1990). In these circumstances, whether the FCC intends to allow a carrier fully to recapture L, S & J expenses initially disallowed under the new rule is simply not clear enough for us to conclude that deferring review of the rules will not work a continuing hardship upon the carriers.

In sum, we find that both the fitness and the hardship factors favor immediate review of these rules. We thus proceed to the merits.

## III. Merits

■ We approach the FCC's ratemaking and accounting classification decisions deferentially, reversing only if the agency's action is arbitrary and capricious. *See American Telephone and Telegraph v. United States*, 299 U.S. 232, 236–37, 57 S.Ct. 170, 172–73, 81 L.Ed. 142 (1936); *MCI Telecommunications Corp. v. FCC*, 675 F.2d 408, 413 (D.C.Cir.1982); *AT & T Information Systems, Inc. v. FCC*, 854 F.2d 1442, 1447 (D.C.Cir.1988). Even so, the FCC's opinions we review here must be reversed, for two related reasons. First, although the agency set out to change accounting classifications and presumptions with respect to all violations of federal statute law, it did not adequately justify its application of the rules beyond the antitrust context. Second, while the FCC considered in some detail the effect of the rules on the various incentives facing the carriers, there are significant gaps in its analysis. Consequently, the agency's reasoning is not sufficient to support its rule.

As we have seen, the agency's new-found interest in reversing the presumption that L, S & J costs are recoverable stems from the large antitrust judgment entered against the carriers in the *Litton* case. Thus, while the agency's proposal was applicable from the outset to L, S & J costs arising from the violation of any federal statute, the Notice of Proposed Rulemaking reports the agency's intention to "focus on antitrust cases for purposes of [its] analysis," *Notice* at 3, and the Order notes the special "importance of [the Commission's] concern with anticompetitive activity by [telecommunications] common carriers." 2 FCC Rcd at 3244.

■ As the agency also noted in the Order, "Congress has given the Commission authority to enforce [common carriers'] compliance with the Clayton Act." *Id.* We have no doubt, therefore, that the agency has a special responsibility, and we may presume a concomitant expertise, regarding the competitive behavior of the common carriers subject to its oversight. It is thus understandable if the agency prefers to focus on antitrust "for purposes of [its] analysis." The agency may not merely assume, however, that an analysis that supports a rule for antitrust cases (a

term we use literally here and throughout) also supports its extension to "all federal cases." Because liability under other types of laws may implicate different considerations relevant to recovery from ratepayers, the agency's focus on antitrust was almost guaranteed to obscure the justification, if any, for extending the rules beyond antitrust.

### A. *The Rules in the Antitrust Context*

We start with the proposition that it is a legitimate aim of rate regulation to protect ratepayers from having to pay charges unnecessarily incurred, including those incurred as a result of the carrier's illegal activity—of whatever sort. *See NAACP v. FPC,* 425 U.S. 662, 668, 96 S.Ct. 1806, 1810, 48 L.Ed.2d 284 (1976) (agency has duty to prevent its regulatees from charging rates based upon "illegal, duplicative, or unnecessary" costs); *see also id.* at 666, 671, 96 S.Ct. at 1809, 1812. Here, the FCC made the following specific finding regarding the run of antitrust judgments:

> A course of conduct that leads to an antitrust judgment is often the result of a corporate strategy that could benefit shareholders if the management succeeds in avoiding liability, but such conduct rarely, if ever, produces any benefit for ratepayers.... Very compelling evidence would, of course, be required to justify a conclusion that ratepayers benefited from violations of statutes that are designed, in substantial part, to protect consumers.

*Order,* 2 FCC Rcd 3244.

The theory of the antitrust laws supports the FCC's observation that activities that give rise to antitrust liability do not generally benefit ratepayers. *See* R. Bork, *The Antitrust Paradox* 7 (1978) ("the only legitimate goal of antitrust is the maximization of consumer welfare"). Of course, there may be exceptions to the general rule; for example, a supplier's suit alleging that a carrier has somehow unlawfully exercised monopsony power complains only of a wealth transfer from the supplier to the carrier (and on to the ratepayers to the extent that the carrier's gain is passed

along in the form of lower regulated rates). The Commission acted quite reasonably, however, in aligning the presumption (against recovery) with the majority of antitrust cases, in which consumers do not benefit from the conduct occasioning liability. Furthermore, as we understand it—the agency is not explicit on this point—the Commission will allow the carrier to rebut that presumption in the unusual case by showing that ratepayers were expected to benefit from the conduct occasioning antitrust liability.

### B. *Litigation Expenses*

We also agree with the Commission's position that it may reasonably erect a presumption against the recovery of litigation expenses wherever it may do so with respect to judgments and settlements. As we have said, the FCC may disallow any expense incurred as a result of carrier conduct that cannot reasonably be expected to benefit ratepayers. The cost a carrier incurs in defending a lawsuit that ends in a determination that it violated the anti-trust law is, like the judgment itself, incurred as a result of the carrier's illegal activity; if the carrier fails to rebut the presumption that the underlying conduct was not in the interests of ratepayers, then allowing recovery of its litigation costs via calculation of the carrier's revenue requirement would force ratepayers to subsidize the carrier's illegal conduct.

Nor is *Appalachian Electric Power v. FPC,* 218 F.2d 773 (4th Cir.1955), on which the carriers rely, to the contrary. In that case, the court concluded that the cost of litigation to determine the necessity of obtaining a license should be included in rate calculations because the litigation was "unquestionably" undertaken for the benefit of the utility project, *id.* at 777, and thus for the benefit of ratepayers.

In sum, if the FCC has justifiably shifted the presumption with regard to a class of judgments and settlements, such as antitrust, then symmetrical treatment of litigation expenses is justified for the same reason, *viz.* lack of ratepayer benefit. It follows that if the carrier rebuts the presump-

tion in a particular case, it should recover its reasonable litigation expenses as well as any judgment or settlement cost it incurred.

The carriers also object that the means by which the Commission proposed to disallow litigation expenses constitutes retroactive ratemaking. Because the Commission geared recoverability to the question whether the carrier ultimately prevails in the lawsuit, it provided that litigation expenses initially booked above the line and recovered from ratepayers be treated as having been non-recoverable once the carrier settles or loses the case, and anticipated that it would use the next ratemaking proceeding to return those monies to ratepayers.

On reconsideration, the Commission responded to the carrier's retroactive ratemaking argument only by reiterating that "[a]mounts booked below-the-line as a result of [a judgment or a settlement] may be addressed in the carrier's next following ratemaking proceeding," and adding the observation that

> the new procedures are essentially the mirror of those which were in effect before. Under our old procedures, most litigation related expenditures were initially booked into operating accounts, which created a presumption of allowability for ratemaking purposes. This presumption could be overcome in a subsequent proceeding.

4 FCC Rcd at 4099. This is hardly an adequate response to the retroactive ratemaking objection. The old procedure does not appear ever to have been tested, if indeed it was ever used; and the Commission gives us no particular reason for believing that that procedure would not itself have constituted retroactive ratemaking. On brief to this court, the Commission does join the issue, but we cannot allow counsel to salvage the rule with an argument that the Commission never adopted.

## C. *Beyond Antitrust*

The FCC's extension of its new L, S & J accounting rules beyond antitrust violations to all federal statutes stands upon an unsure footing. It is doubtful whether the agency may use its powers, and in particular its ratemaking power, to deter violations of federal statutes generally. Congress has not expressly given such authority to the agency. In any case, the FCC eschews the policeman's general jurisdiction, stating unequivocally in its brief that it "does not enforce the vast majority of federal statutes and has no office in the deterrence of conduct that violates those statutes."

As we made clear in considering the agency's decision that antitrust L, S & J expenses should be recorded below the line, we do not take issue with the premise that it is a legitimate aim of rate regulation to protect ratepayers from paying the costs a carrier incurs for an activity that is not undertaken for their benefit. It does not matter whether such activity violates the antitrust laws, another law, or no law.

In the Order, however, the FCC did not justify its extension of the rules to all federal statutory violations by reference to the criterion of ratepayer benefit. On brief, we are reminded that "the Commission pointed out [in the Order, 2 FCC 2d at 3244, that] adverse judgments are not normally the byproduct of activities that benefit ratepayers." Although we are inclined to read the referenced passage as relating literally to antitrust cases, we accept counsel's broader reading for the sake of their argument. As applied to "all federal cases," however, the proposition is neither self-evident, as it is in the antitrust context, nor bolstered by either analytical or empirical support.

Including litigation expenses, judgments and settlements in the revenue requirement can only be said to involve, as the FCC puts it on brief, a ratepayer "subsidy" of the carrier's illegal activity to the extent that the activity giving rise to the liability could not, at the time it was undertaken, reasonably be expected to produce a net benefit to ratepayers. Consider the following example: A carrier has to choose between instituting a strict pollution monitoring policy or a lax policy that is arguably sufficient under the law and would cost $50,000 less than the strict policy. The carrier will

surely be sued under a federal statute if it adopts the lax policy, and there is a 10% chance that it will lose; if it does, the plaintiff would recover $100,000, making the expected or ex ante cost of the lawsuit ($100,000 × .10 =) $10,000. Thus the carrier reasonably determines that adopting the lax policy will produce a net benefit of $40,000 to the ratepayers, who would otherwise have to pay the cost of the strict monitoring policy. It would be misleading to say that requiring ratepayers to bear the cost of the resulting judgment, if any, causes them to subsidize the carrier's illegal activity. The carrier made the "right" decision, i.e., what the ratepayers would have decided in their own economic self-interest; it just turned out to be the "wrong" decision as a matter of how the law was finally interpreted. Perhaps the agency has a more capacious notion of ratepayer benefit than merely paying lower rates. If it does, however, it has neither said as much nor indicated why ratepayers are generally harmed in some non-economic way by the violation of federal statutes.

■ In any event, as we read the orders under review, the FCC rested its case against recovery of L, S & J costs outside the antitrust context not on the want of ratepayer benefit but on an entirely different line of reasoning. Adverse judgments based upon federal statutory violations do not represent "a normal and recurring business expense" because

such judgments result from violation of statutes which establish an important public policy. Violation of *any law* should be excluded from treatment as a normal part of [a] company's operations.

*Id.* at 3244 (emphasis added). *See id.* at 3248 ("it is the entry of a court decision that a law has been violated that drives our treatment of those costs"). On reconsideration, the agency elaborated as follows:

The new rules, in our view, balance the need to distinguish between violations that raise public policy implications and judgments that deal with local matters, such as tort actions, that any business may face in its day-to-day operations. The distinction that we have made, which

focuses on the violation of a federal law, provides a high degree of uniformity and certainty as to how judgments and settlements are recorded in the [Uniform System of Accounts]. . . . The record herein does not establish any other valid distinction for accounting purposes to justify a presumption of ratemaking allowance for certain types of federal law violations but no presumption for others.

*Reconsideration Order*, 4 FCC Rcd at 4094. The FCC went on to say that its "conclusion is buttressed" by some other considerations, *id.*, but it is clear enough that the agency's decision rests upon the above-quoted passage and that it must stand or fall on the adequacy of the reasoning therein.

Perhaps the most obvious defect in the agency's analysis is that it does not even attempt to explain why all federal statutes "raise public policy implications." This terse assertion can hardly be viewed as an adequate foundation for application of the rules outside the antitrust context in light of the agency's own disavowal of responsibility for the compliance of its regulatees with federal law generally. Relatedly, the FCC nowhere explains why state statutes, or for that matter decisions of the common law courts, do not "raise public policy implications" relevant to its regulation of the carriers' interstate rates.

As quoted above, the Reconsideration Order does state that extending the rules to alleged violations of all federal laws "provides a high degree of uniformity and certainty." (The virtue of uniformity, apart from the certainty it provides, is not clear; and we treat uniformity as a mere makeweight.) But the agency's emphasis elsewhere upon the rebuttable nature of the presumption against recovery of an expense recorded below the line substantially undercuts the certainty aspect of this rationale. There is no greater certainty regarding the ultimate recoverability of a resulting expense merely because the carrier rather than the Commission staff has the burden of rebutting the initial accounting presumption unless—and this is key—the costs entailed in rebutting that presump-

tion are significant. If those costs are significant, then it would be irrational to begin with a presumption that does not accurately presage the proper classification of the expense in the majority of cases. *See generally* Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960).

Finally, we note the Commission's observation that the "record herein does not establish any other valid distinction for accounting purposes to justify a presumption of ratemaking allowance for certain types of federal law violations but no presumption for others." *Reconsideration Order*, 4 FCC Rcd at 4094. The agency must articulate a reason for the line it has chosen. If it cannot justify altering the presumption for any litigation other than antitrust litigation, then it may not extend the presumption to all federal statutes merely by pointing out that none of the other statutes is a more likely candidate than the rest.

We conclude that the FCC has not justified the application of its new accounting rules to L, S & J costs that a carrier incurs in the defense of non-antitrust lawsuits. If the FCC undertakes hereafter to provide the needed justification, we trust it will begin by jettisoning the confusing terminological equation that so obscured its reasoning in the orders now under review.

## D. *Incentive Effects*

■ Although we conclude below that the agency opinions are also deficient in analyzing how the rules affect the incentives facing the carriers, we do not accept the intervenors' claim that the rule providing for a pre-judgment settlement to be recorded above the line only to the extent of its "nuisance value" (that is, in the amount of the estimated litigation expenses avoided by reason of the settlement) provides an undue disincentive for carriers to settle lawsuits. As the agency pointed out, *Notice* at 5; *Order*, 2 FCC Rcd at 3245, once it requires the judgment in a certain type of action be recorded below the line, failing to accord similar treatment to a settlement of the same action would create a strong incentive for a carrier to settle

such a suit even if the settlement is for an amount greater than the expected liability. In any case, failing to require settlements to be recorded below the line would obviously compromise the integrity of the regulatory scheme: if the activity resulting in the lawsuit was for the benefit of the carrier, rather than for that of the ratepayers, there is no reason for requiring ratepayers to pay the cost of the settlement, even if it is in an amount less than the carrier's expected liability.

On the other hand, because both judgments and prejudgment settlements, to the extent they exceed nuisance value, come out of the carrier's pocket, the carrier will have an incentive to settle the suit at any amount that does not exceed its expected liability. If anything, under the FCC's rule, the carrier will have an excessive incentive to settle prior to judgment, so that at least its litigation expenses (actual and expected) will be recorded above the line.

As the petitioners point out, however, other incentives may be skewed under the Commission's rules. The (as yet unjustified) extension of the rules to all federal litigation gives the carrier a perverse incentive in deciding whether to act in a way that is beneficial to ratepayers but may later be found to have been illegal. If the carrier must absorb the cost resulting from activity that violates a federal law (or must incur significant expense in order to rebut the presumption against recovery of that cost), but may include in its revenue requirement the cost it incurs in order to avoid the risk of such a violation, then it will tend to be overly conservative in its decisions concerning activities that are very likely to benefit ratepayers but might conceivably be found to violate federal law. We instanced above the choice of a costly pollution monitoring policy that eliminates even a small risk of liability for having violated a federal statute. The carrier might also adopt a less aggressive tax strategy, either on its own initiative or in response to the first stirrings of the Revenue Service. Similarly, a carrier might be excessively willing to placate a party threatening to file a federal lawsuit, for example, by entering into a settlement os-

tensibly limited to pendent state claims, or by dropping its own potential counterclaims. In each of these situations, the Commission's rules will cause an increase in the costs to be borne by ratepayers.

The rules may also create perverse incentives for the conduct of litigation. In its Order on Reconsideration, the FCC decided that a carrier would be allowed to record a pre-judgment settlement above the line to the extent that the amount of the settlement does not exceed the nuisance value of the suit. It declined, however, to apply this rule to a settlement entered after an initial adverse judgment. *See* 4 FCC Rcd at 4097–98. Yet the economics of the two situations are identical. As the agency recognized in the pre-judgment context, if the carrier cannot recover what it pays out in a settlement, then it has an incentive to continue litigating—in the post-judgment context, to pursue an appeal—even if the cost of doing so exceeds the amount for which it could settle the case. Again, the effect is to increase the amount recoverable from ratepayers. The agency's attempt to distinguish between the pre- and post-judgment situations—that "[t]he issuance of an adverse judgment by a court should place a heavier burden on a carrier to show why ratepayers should bear any cost of a subsequent settlement," 4 FCC Rcd 4098—does not address the incentive it creates by refusing to extend the nuisance value exception to settlements entered while an appeal is pending.

We recognize that the FCC's orders do attempt to deal with some of the incentive effects of its rules, that no system of regulation will be perfect in this regard, and that any perverse incentive effect may be mitigated to the extent that a carrier may, as a practical matter, rebut the presumption against recovery. Nevertheless, because the FCC's rules may have very significant effects (indeed, even if they are ultimately re-adopted only with respect to antitrust litigation), we believe that the agency should explicitly address the incentive problems discussed above.

IV. CONCLUSION

For the reasons stated, we grant the petition and vacate the orders.