## IROQUOIS GAS TRANSMISSION SYSTEM, L.P., Petitioner

v.

## FEDERAL ENERGY REGULATORY COMMISSION, Respondent

### Nos. 97–1276 and 97–1533.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 14, 1998.

Decided July 21, 1998.

Joseph S. Koury argued the cause for petitioner. With him on the briefs were James T. McManus, Jeffrey A. Bruner and Paul W. Diehl.

Samuel Soopper, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel. John H. Conway, Deputy Solicitor, entered an appearance.

Dennis Lane argued the cause for intervenors Public Service Commission of the State of New York, et al. With him on the brief were David W. D'Alessandro, Mary Ann Walker, Neil L. Levy, Richard A. Rapp, Jr., Lillian S. Harris and Kevin J. McKeon.

Before: WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Concurring opinion filed by Circuit Judge WALD.

WILLIAMS, Circuit Judge:

Iroquois Gas Transmission System, L.P., ran up substantial legal defense costs as a result of federal investigations into environmental violations committed in its construction of a natural gas pipeline. The Federal Energy Regulatory Commission issued orders excluding these legal costs from the rate base used to calculate Iroquois's permissible charges, explaining that Iroquois had failed to carry the burden of proving that the costs were prudently incurred. Iroquois says the orders were grounded in an impermissible presumption of non-recoverability and asks us to set them aside, relying primarily on our decisions in *Mountain States Telephone and Telegraph Co. v. FCC*, 939 F.2d 1021 (D.C.Cir.1991) ("*Mountain States I*") and *Mountain States Telephone and Telegraph Co. v. FCC*, 939 F.2d 1035 (D.C.Cir.1991) ("*Mountain States II*"). Because the Commission has failed to come to grips with the questions that *Mountain States II* said must be answered when addressing a utility's recovery of legal expenses, we remand the case for a more reasoned decision.

\*     \*     \*

In November 1990 the Commission granted Iroquois a certificate of public convenience and necessity under Section 7 of the

Natural Gas Act (the "Act"), authorizing the company to build and operate a new pipeline stretching from the Canadian border to Long Island. The pipeline went into full service in January 1992. Before long, however, Iroquois found itself in trouble for environmental violations. Around November 1991 the U.S. Attorney's Office for the Northern District of New York, in conjunction with the FBI and the Environmental Protection Agency, began an investigation into whether Iroquois's construction activities violated the Clean Water Act. The record suggests that the investigation focused on points where the pipeline crossed creeks and streams in upstate New York, allegedly discharging silt and sediment in violation of Iroquois's Clean Water Act permit, and on Iroquois's alleged failure to build so-called trench breakers, which control soil erosion and pipeline corrosion. An Army Corps of Engineers inspection report from early 1992 cited a potential overall penalty of more than $115,000,000. Civil investigations, presumably closely related, were also undertaken by the U.S. Attorney's offices for the Northern, Eastern, and Southern Districts of New York. In addition, FERC's own enforcement staff launched a separate investigation to determine whether Iroquois had violated the environment-related conditions of its Section 7 certificate. Ultimately an Iroquois affiliate and four of its employees entered into guilty pleas and a civil settlement costing $22 million in fines and penalties, and Iroquois consented to a settlement with the Commission admitting violations of environmental conditions in its certificate and agreeing not to pass the fines and penalties on to its ratepayers. *Iroquois Gas Transmission System, L.P.*, 75 FERC ¶ 61,205 (1996).

In the course of resolving these disputes Iroquois ran up a legal bill of more than $15,000,000. While the various investigations were still under way, Iroquois filed with the Commission for a general rate increase to recover its pipeline construction costs. The rate proceeding culminated in a settlement between Iroquois and its customers resolving all issues except the rate and accounting treatment of the legal defense costs. Hearings on these reserved issues were held before an administrative law judge, who determined that the legal costs were not unrecoverable *per se,* and observed that "[t]he participants have presented nothing to rebut Iroquois's position that the legal costs were incurred as an appropriate and normal response to investigatory activities arising from the construction undertaken to provide service to the ratepayers." *Iroquois Gas Transmission System, L.P.,* 72 FERC ¶ 63,004, at 65,027 (1995).

The Commission reversed the ALJ's initial decision and held that Iroquois's legal defense costs could not be included in its rate base. *Iroquois Gas Transmission System, L.P.,* 77 FERC ¶ 61,288 (1996). "Allowing recovery of Iroquois' litigation expenses," the Commission concluded,

> would fail to recognize the interests of Iroquois' ratepayers, shared by the Commission, that emanate from Section 7 of the NGA. These interests are to ensure that the pipeline is built in compliance with all applicable federal environmental and safety laws so as to prevent any future personal injuries or environmental damage.

*Id.* at 62,280. The Commission based its disallowance of recovery on Iroquois's failure to demonstrate any countervailing economic or non-economic benefit to ratepayers from the activities that gave rise to the investigations. The Commission denied Iroquois's request for rehearing, *Iroquois Gas Transmission System, L.P.,* 78 FERC ¶ 61,216 (1997), and later rejected similar claims in a second rate case filed by Iroquois. *Iroquois Gas Transmission System, L.P.,* 77 FERC ¶ 61,-352, at 62,538 (1996), *rehearing denied,* 80 FERC ¶ 61,199, at 61,797–98 (1997). Iroquois petitioned for review in this court.

At the outset the Commission concedes two propositions, one general and one specific to this case. First, the Commission admits that although the Act gives the natural gas company the burden of showing that a proposed rate increase is just and reasonable, 15 U.S.C. § 717c(e), as a matter of FERC practice "a natural gas company is ordinarily not required to show that all of its expenditures were prudent unless serious doubts are raised regarding the prudence of those

costs." FERC Br. at 24. See, e.g., *Trans World Airlines, Inc. v. CAB*, 385 F.2d 648, 657 (D.C.Cir.1967); *Minnesota Power & Light Co.*, 11 FERC ¶ 61,312, at 61,645 (1980). Second, the Commission does not seriously contest that it effectively raised a presumption against recovery in this case, putting the burden on Iroquois to demonstrate that its expenditures were prudently incurred. See 78 FERC at 61,927 ("[S]ince [Iroquois] was seeking to recover the legal defense costs in its rates, it had the burden of proving that the costs were just and reasonable."). Indeed, at times the Commission seemed to erect something close to an irrebuttable presumption against recovery. See *id.* ("Iroquois placed itself *in the untenable position* of arguing that its illegal activities, supposedly taken to save time and money during construction, were in the interests of its ratepayers, and, therefore, just and reasonable.") (emphasis added).

The Commission contends, however, that it adequately justified its decision to invert the normal presumption in this case, because Iroquois's legal costs by their very nature raised a serious doubt as to prudence (i.e., because they grew out of civil and criminal violations).[1] See FERC Br. at 24. One immediate problem with this approach is that as of the time the hearing was held before the ALJ no violations had been proven or admitted; the investigations were still ongoing and the precise contours of any eventual charges were still uncertain. But even if that problem is put aside, the Commission runs into another barrier: our decisions in the *Mountain States* cases.

In *Mountain States I* we held that the Federal Communications Commission had failed to provide a reasoned justification for its presumption that antitrust litigation expenses incurred by AT&T could not be recovered from ratepayers. 939 F.2d at 1029–

35. "Illegality of carrier conduct from which an antitrust litigation expense stems," we concluded, "does not inexorably compel or warrant either rejection or stigmatization of the expense as a factor in rate calculations." *Id.* at 1031. We noted that in two tax decisions the Supreme Court had described litigation expenses—even those incurred in a losing cause—as ordinary and legitimate costs of doing business. *Id.* at 1031–32 (citing *Commissioner v. Heininger*, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943), and *Commissioner v. Tellier*, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966)).

In *Mountain States II*, issued the same day as *Mountain States I*, we reviewed a new FCC regulation governing the accounting treatment of litigation expenses generally. The new rule attached a presumption of non-recoverability to all litigation expenses that resulted in an adverse final judgment or post-judgment settlement in any federal statutory case, unless the regulated company could show that ratepayers benefited from the underlying activity. 939 F.2d at 1039. Holding that "the FCC may disallow any expense incurred as a result of carrier conduct that cannot reasonably be expected to benefit ratepayers," *id.* at 1043, we found the new rule quite sensible in the context of antitrust violations, since the effect of such violations is typically to injure consumers. But we went on to say that the FCC had inadequately justified its application of the new rule to statutory violations beyond antitrust, where an absence of ratepayer benefit "is neither self-evident, as it is in the antitrust context, nor bolstered by either analytical or empirical support." *Id.* at 1044. By the same token we rejected the FCC's "terse assertion" that violations of federal statutory law "raise public policy implications" sufficient to justify presumptive disallowance of associated litigation costs. *Id.* at 1045.[2]

---

1. When asked by the ALJ to come forward with evidence raising doubts about the prudence of the costs, FERC's staff counsel answered, "[I]t is our belief that the recoverability issue is simply a matter of fairness, and there wasn't a whole lot to say about it." Similarly, counsel for the Public Service Commission of the State of New York responded, "It's our view that these are not the typical costs that are incurred to provide service

by a utility and we cannot conceive of a scenario under which they would be recoverable."

2. On remand the FCC decided to retain its special accounting rules with respect to antitrust judgments and settlements, but abandoned them with respect to antitrust litigation expenses and all costs arising from other types of litigation. *In the Matter of Accounting for Judgments and Other*

We emphasized in *Mountain States II* that the FCC had not taken sufficient account of the perverse incentive effects set in motion by a presumption against recovery of litigation expenses. Such a presumption, we observed, was likely to induce excessive caution in carriers, causing them to shun activities that might conceivably be found to violate federal law, even when those activities promise benefits to ratepayers. *Id.* at 1046. We illustrated the point in a passage whose uncanny relevance to the instant case calls for full quotation:

> Consider the following example: A carrier has to choose between instituting a strict pollution monitoring policy or a lax policy that is arguably sufficient under the law and would cost $50,000 less than the strict policy. The carrier will surely be sued under a federal statute if it adopts the lax policy, and there is a 10% chance that it will lose; if it does, the plaintiff would recover $100,000, making the expected or ex ante cost of the lawsuit ($100,000 × .10 =) $10,000. Thus the carrier reasonably determines that adopting the lax policy will produce a net benefit of $40,000 to the ratepayers, who would otherwise have to pay the cost of the strict monitoring policy. It would be misleading to say that requiring ratepayers to bear the cost of the resulting judgment, if any, causes them to subsidize the carrier's illegal activity. The carrier made the "right" decision, i.e., what the ratepayers would have decided in their own economic self-interest; it just turned out to be the "wrong" decision as a matter of how the law was finally interpreted. Perhaps the agency has a more capacious notion of ratepayer benefit than merely paying lower rates. If it does, however, it has neither said as much nor indicated why ratepayers are generally harmed in some non-economic way by the violation of federal statutes.

*Id.* at 1044–45.

The Commission quoted this passage in its initial order, see 77 FERC at 62,279–80, acknowledging its relevance but claiming to find refuge in its final two sentences. While the FCC in *Mountain States II* had failed to

articulate any noneconomic harm flowing from violations of federal statute law, the Commission said, here Iroquois's ratepayers have a general interest in compliance with federal environmental and safety laws, and thus are harmed whenever those laws are violated. 77 FERC at 62,280. The inclusion of environmental compliance requirements in Iroquois's Section 7 certificate, according to the Commission, represented an "implicit recognition that it would be appropriate for ratepayers to pay costs that may be incurred to build a pipeline in an environmentally responsible manner. It is not reasonable then to elevate the ratepayer interest in saving time and money to such a preeminent position in the interests to be considered when deciding whether costs are recoverable in the rates." *Id.*

We pause here to note that the Commission correctly placed its initial focus on the prospect of ratepayer benefits from the underlying *activity* rather than from the litigation. Even though it is commonly prudent (in the conventional sense of the term) to incur legal expenses in defending conduct that turns out to have been illegal, there appears no reason why ratepayers should bear the expense of defending conduct that had no *ex ante* prospect of benefiting them. See *Mountain States II*, 939 F.2d at 1043.

Nonetheless, we find the Commission's treatment of *Mountain States II* unconvincing. The asserted ratepayer interest in compliance with environmental and safety laws is virtually as generic as the amorphous "public policy implications" we found inadequate to justify the presumption of nonrecoverability in *Mountain States II*, 939 F.2d at 1045. Because all citizens share an interest in widespread compliance, not just with environmental or safety laws but with laws of any kind, the Commission's approach would result in the presumptive disallowance of all litigation expenses leading to anything short of outright triumph for the regulated entity.

More important, the Commission's approach utterly fails to respond to the problem of incentives posed in *Mountain States II*. Iroquois's ratepayers, in common with

Costs Associated With Litigation, *12 FCC Rcd.* 5112 (1997).

the general population of upstate New York, undoubtedly share an interest in maintaining the purity of the region's creeks and streams. But the same ratepayers have a unique and concentrated interest in timely and efficient pipeline construction.[3] Although our concurring colleague asserts that some ratepayers would willingly pay higher rates in exchange for assurances of environmental compliance, see Concurring Op. at 403–04, laws obligating firms to satisfy environmental standards are necessary precisely because most consumers, if given a choice, appear unwilling to pay the full cost of satisfying higher standards. If consumer demand were actually enough to cause ordinary firms in competitive industries to incur the costs of protecting the environment, there would be little need for environmental regulation.

Indeed, because of the limitation of the utility's rates to recovery of cost under the statute's "just and reasonable" formula, the ratepayers have the same interest in optimizing environmental compliance costs as they would if they built the pipeline themselves through a cooperative or a partnership. As our opinion in *Mountain States II* made clear, a firm incurring optimal environmental compliance costs will on occasion take measures that are ultimately found illegal. In *Mountain States II*'s example, where a saving of $50,000 runs a 10% risk of triggering $100,000 in additional costs, the *ex ante* expected benefit for the ratepayers is $40,000. Contrary to our concurring colleague's suggestion, see Concurring Op. at 404, *Mountain States II* does not establish a ratemaking principle that affirmatively encourages regulated companies to violate environment-related certificate conditions. It does, however, recognize that ratepayers often benefit

from activities that tack reasonably close to the wind, and that policies inducing management to pursue absolutely risk-free environmental compliance measures are therefore not, on their face, in the ratepayers' interest.

Yet the Commission's approach seems sure to chill some lawful activity beneficial to ratepayers; indeed, it would seem calculated to encourage regulated firms to avoid any and all litigation risks. "[L]awsuits are a recurring fact of life in operating a business," *Mountain States I*, 939 F.2d at 1034, and in the area of federal environmental regulation the line between permissible and impermissible conduct is often drawn in (muddy) water. Compare *United States v. Mango*, 997 F.Supp. 264, 285 (N.D.N.Y.1998) (holding that CWA authorized Army Corps of Engineers to regulate Iroquois's "backfilling of trenches excavated in waterways and wetland areas") with *id.* at 283–87, 295–98 (holding that CWA does not authorize Corps to impose permit conditions not related to discharge of dredged or fill material, such as those designed to prevent wetland drainage). Thus the Commission must do a better job of explaining why all activities that turn out to violate environmental laws should be presumed unlikely "to benefit ratepayers," as required for presumptive disallowance under *Mountain States II*, 939 F.2d at 1043.[4]

The Commission's attempted distinction of *Appalachian Electric Power Co. v. FPC*, 218 F.2d 773 (4th Cir.1955), is also insubstantial. There the Fourth Circuit held that legal costs incurred by a regulated utility in an unsuccessful challenge to the Commission's jurisdiction over a proposed power plant were recoverable from ratepayers as expenses necessary to the development of the project. According to the Commission, the

---

**3.** In fact, Iroquois's customers evidently had a special interest in speedy construction. In Iroquois's certificate proceeding the Commission found as a general matter that the pipeline's proposed customers "have an urgent and significant need for additional natural gas supplies during the 1991–1992 winter season." *Iroquois Gas Transmission System, L.P.*, 52 FERC ¶ 61,091, at 61,343 (1990). In a later order denying a stay of Iroquois's construction certificate, the Commission noted the dangers of "delay[ing] further the badly needed entry of the Iroquois-supplied gas into the Northeast market." *Iro-*

*quois Gas Transmission System, L.P.*, 54 FERC ¶ 61,103, at 61,342 (1991).

**4.** The Commission mystifyingly asserted that Iroquois's agreement not to recover any of the $22 million in fines and penalties from its ratepayers "impl[ied] that the pipeline itself recognized that the ratepayers did not benefit from the illegal activities." 77 FERC at 62,281. Given that the same agreement explicitly reserved the issue of recoverability of legal expenses, see *id.* at 62,277 n. 11, we can see no basis for the supposed inference.

costs of the jurisdictional challenge in *Appalachian* were an example of "normal civil litigation" costs; other examples given by the Commission were the "cost of attorneys hired to secure any state or federal permits, or litigation to perfect eminent domain rights or to establish property values." 77 FERC at 62,281. Iroquois's case is different, the Commission said, because it "is not the type of case where a regulated company, interpreting the law in a manner most favorable to the company, loses a court case." *Id.* In fact that description seems, at least at first glance, to fit Iroquois's case quite snugly. Beyond offering a few conclusory statements ("there is no punitive aspect associated with the loss of a challenge [to] the agency's regulatory jurisdiction," *id.*), the Commission never explains why action based on a legal interpretation "most favorable to the company" should have been presumptively beneficial to ratepayers in *Appalachian* but presumptively harmful here.[5]

In short, the Commission has not made clear which types of legal defense costs are presumed recoverable for ratemaking purposes and which not, or why the costs here belong on the nonrecoverable side of the line. Particularly in light of the explicit discussion of pollution laws in *Mountain States II*, the Commission's burden here requires more than the making of general allusions to the public interest in compliance with environmental statutes or with Section 7 certificate requirements. Of course, we do not reach the ultimate question whether Iroquois's legal defense costs were in fact prudently or imprudently incurred, and thus whether they may or may not be borne by the ratepayers. We hold only that the Commission has not adequately justified its apparent decision to impose upon Iroquois the burden of proving that its activities benefited ratepayers.

The case is remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

WALD, Circuit Judge, concurring in the judgment:

Although I agree that this case must be remanded for further consideration, I write separately to emphasize the breadth of the analysis FERC should undertake on remand. Although the ultimate issue in this case is who is to bear Iroquois's litigation costs, not whether Iroquois's conduct was legal or illegal, the latter consideration is certainly relevant, in my view. It is worth noting, therefore, that Iroquois admitted violating several environmental-related conditions of its section 7 certificate, and our discussion of whether it is "just and reasonable" for the company to then shift the litigation costs related to those violations to its ratepayers should in no way be read as directing FERC to ignore the harm to the environment that has been suffered as a result of those violations. Rather, I think it important that the calculus of whether a rate is reasonable take into consideration noneconomic benefit as well as economic benefit. It may well be true that a thoroughly informed ratepayer will prefer a cheaper product obtained by way of environmental violations over a more expensive product produced legally. But I'm not sure that this can be presumed to be the case, as the majority opinion appears to assume. In an antitrust case, as *Mountain States II* recognized, the analysis is easier: A presumption that litigation expenses associated with a violation of the antitrust laws are disallowed is reasonable because we can assume that consumers would prefer to buy products in a competitive market, since competition is presumed to make products both cheaper and better. Thus, it would be difficult to show that anticompetitive conduct

---

5. The Commission suggests in passing that the present case differs from *Appalachian* in that "Iroquois admitted to knowingly violating federal laws." 77 FERC at 62,281. Litigation costs incurred in defense of knowing or willful violations might indeed call for more stringent treatment under the *Mountain States II* framework, though "willful" and "knowing" are of course "word[s] of many meanings" depending upon context, see *Bryan v. United States,* ⸺ U.S. ⸺, ⸺, 118 S.Ct. 1939, 1944–46, 141 L.Ed.2d 197 (1998), and the settlement context suggests the presence of tradeoffs whose implications are unclear. In any event, the Commission nowhere else relies on or develops the argument that Iroquois committed knowing violations, and we can find no support in the record before us to support such an assertion.

would be beneficial to ratepayers in any way. Here, however, the equation is not so simple: We cannot presume that noncompliance with environmental regulations would be a benefit to ratepayers if the economic costs of compliance outweigh the economic costs of noncompliance, since the noneconomic benefit of compliance must also enter the calculus. It may well be the case, for example, that a ratepayer would prefer to pay higher rates in exchange for the assurance that the pipeline from which it obtains its gas is in compliance with environmental laws. (I can imagine several reasons for this preference: for the goodwill benefits compliance confers, to aid in thwarting litigation, or even because the ratepayer lives in the geographic area for which noncompliance is proposed and will suffer as a citizen.) I agree that under our precedent FERC's simple assertion that ratepayers have an interest in compliance with the law is insufficient to disallow recovery of Iroquois's litigation costs. As *Mountain States II* holds, FERC must also take into consideration the economic benefits noncompliance may confer, though I must admit

I have a good deal of trouble with the proposition that FERC can validly attach an environmental condition on a section 7 permit, but the company is simultaneously encouraged by ratemaking principles to violate it if it can build the pipeline cheaper or faster by doing so. That kind of law makes no sense to me. But I also believe that even the *Mountain States II* calculus is far more expansive than the majority opinion suggests. By seeming to give priority to economic over noneconomic considerations, I fear that the majority will dissuade FERC from adequately considering the environmental costs of Iroquois's conduct, costs that may well affect the decision about whether forcing ratepayers to bear its litigation costs is indeed "just and reasonable."