The **GRAND COUNCIL OF THE CREES (OF QUEBEC) and New England Coalition for Energy Efficiency and the Environment,** Petitioners,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Hydro–Quebec and H.Q. Energy
Services (U.S.) Inc.,
Intervenors.

No. 98–1280.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1999.

Decided Jan. 11, 2000.

William Andrew Nelson argued the cause for petitioners. With him on the briefs were James A. Dumont, Leonard A. Busby, and Howard J. Bashman.

Larry D. Gasteiger, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were Jay L. Witkin, Solicitor, and John H. Conway, Deputy Solicitor.

Pierre F. de Ravel d'Esclapon was on the brief for intervenor H.Q. Energy Services (U.S.) Inc. in support of respondent.

Before: EDWARDS, Chief Judge, WILLIAMS and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

H.Q. Energy Services (U.S.) Inc. ("H.Q. Energy") is a wholly owned subsidiary of Hydro–Quebec, an electric utility that owns and controls facilities for the generation, transmission and distribution of electric power in Quebec. In November 1997 the Federal Energy Regulatory Commission authorized H.Q. Energy to sell power within the United States at market-based rates rather than under the traditional cost-based rate ceilings. *H.Q. Energy Services (U.S.) Inc.*, 81 FERC ¶ 61,184 (1997) ("Order"). Petitioners, the Grand Council of the Crees (of Quebec) (the "Grand Council" or the "Crees") and the New England Coalition for Energy Efficiency and the Environment (the "Coalition"), sought rehearing; they argued mainly that H.Q. Energy and Hydro–Quebec had market power in the generation and transmission of electricity in the United States—market power that was insufficiently mitigated to permit the approval. The Commission denied the petition for rehearing, 82 FERC ¶ 61,234 (1998) ("Rehearing Order"), and the Crees and the Coalition petitioned for review here. We dismiss the petitioners' appeal for want of standing.

\* \* \*

Pursuant to § 205(c) of the Federal Power Act ("FPA"), 16 U.S.C. § 824d(c)

(1994), a power marketer that seeks to engage in electricity sales under the jurisdiction of the Federal Energy Regulatory Commission must place its rate schedule on file with the Commission. H.Q. Energy requested the Commission to accept for filing a rate schedule authorizing it to sell power at market-based rates.

In reviewing such applications, the Commission demands that the power marketer establish that it, and its affiliates, either do not have, or have adequately mitigated, market power in both generation and transmission. The applicant must also establish that it cannot erect barriers to entry, and that there is no evidence of other behavior perceived as anticompetitive, such as affiliate abuse or reciprocal dealing. See *H.Q. Energy Services (U.S.) Inc.*, 79 FERC ¶ 61,152 at 61,651 (1997).

In response to H.Q. Energy's application, several entities, including the Grand Council and the Coalition, moved to intervene. The Grand Council is a political and governmental entity, representing about 10,000 indigenous people of Northern Quebec. The Coalition is "an association of American consumers, customers, birders, recreational canoeists, energy activists and environmental organizations which has actively intervened in regulatory proceedings in Vermont since 1989."

The Commission initially addressed the issue of transmission, finding H.Q. Energy's market power adequately mitigated. 79 FERC at 61,653. Its approach was substantially similar to that which it applies to utilities owning transmission facilities within the United States, namely a requirement that the firm file an open access tariff, with adjustments to account for the different national context. *Id.* at 61,652. Here it found that H.Q. Energy mitigated adequately by submitting proposed transmission tariffs, to be enforced by Quebec's regulatory body, the Regie de l'energie, instead of FERC, and with Canadian rather than U.S. commercial law providing the relevant background rules. The Commission also found that H.Q. En-

ergy satisfied its other requirements for market-based rates except for failing to provide the proper analysis of market power in generation.

H.Q. Energy then made a supplemental filing on generation. The Commission found that the firm's market shares, in the thirteen United States markets analyzed, would range from 27.8% to 35% of installed capacity, and from 31.8% to 38% of uncommitted capacity. 81 FERC ¶ 61,184 (1997). These figures exceeded those of all applications for market-based rates that the Commission had previously accepted. But the Commission identified three factors that in its view adequately reduced the attendant risks. See *id.* at 61,810. In light of our holding on standing we need not explore these. In their petition for review, petitioners challenge the Commission's reasoning, and also allege that the Commission's failure to prepare an environmental impact statement was contrary to its duty under the National Environmental Policy Act ("NEPA").

\* \* \*

Petitioners have failed to demonstrate standing to raise their claims. Although the claims arise under different statutes— and we address their standing to bring each claim in turn—they nevertheless both rest primarily on an allegation of environmental harm. The Grand Council alleges that the Commission's license will "devastate the lives, environment, culture and economy of the Crees." The Crees' reasoning is that H.Q. Energy's license to sell power at market-based rates will lead to an increase in Hydro–Quebec's exports, which will in turn lead to the construction of new hydroelectric facilities, which "will destroy fish and wildlife upon which Cree fishermen, trappers and hunters depend." The Coalition alleges an environmental harm one step further removed in the causal and geographic chain: many species of migratory birds that are found in New York and New England during parts of the year rely on the habitat of Northern Quebec; these birds, including one species

that has been classified as endangered, are threatened by development of hydro-electric projects in that region.

■ We first consider petitioners' claims under the FPA. Although there are very serious doubts whether petitioners have satisfied Article III standing, their more straightforward deficiency is in "prudential standing." Article III standing must be established before any decision is made on the merits. See *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, ——, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998). Under the Supreme Court's recent pronouncement in *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999), however, it is entirely proper to consider whether there is prudential standing while leaving the question of constitutional standing in doubt, as there is no mandated "sequencing of jurisdictional issues." *Id.* at 1570 ("It is hardly novel for a federal court to choose among threshold grounds for denying audience to a case on the merits."). (We return to this issue later, when our reasoning on the substance of prudential standing has been made clear.)

■ To establish prudential standing, plaintiffs generally must show that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute." *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Because prudential standing is an invention of the courts, Congress has the power to dispense with the requirement by statute. See *Bennett v. Spear,* 520 U.S. 154, 163, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) ("Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated.").

■ Petitioners argue that here Congress has dispensed with prudential standing by providing that "[a]ny person ... aggrieved by an order issued by the Com-

mission in a proceeding under this chapter" may apply to have the order reheard, 16 U.S.C. § 825*l*(a). Petitioners rely on *FEC v. Akins*, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), in which the Court stated: "History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly—beyond the common law interests and substantive statutory rights upon which 'prudential' standing traditionally rested." *Id.* at 1783. But the purpose of this pronouncement was evidently only to recognize "person aggrieved" as a congressional means of dispensing with traditional requirements of "legal right," see, e.g., *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 125, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), for the Court went on to cite standard applications of the "aggrieved" language to allow standing for competitors, see *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), or for obviously intended beneficiaries, see *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994 (D.C.Cir.1966) (allowing listeners standing to object to licensing of firm that regularly broadcast programs promoting racial segregation); *Associated Indus. of New York State v. Ickes*, 134 F.2d 694 (2d Cir.1943) (allowing consumers standing to challenge order that fixes prices and prevents competition among sellers).

Petitioners also rely upon *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), in which the Court, construing the Endangered Species Act of 1973 ("ESA"), expressed a "readiness to take the term 'any person' at face value." See *id.* at 164–65, 117 S.Ct. 1154 (finding that the citizen-suit provision allowing that "any person may commence a civil suit" "negate[d] the zone-of-interests test (or, perhaps more accurately, expand[ed] the zone of interests)"). But the Court in *Bennett* emphasized the breadth of the ESA's "any person" formula compared to other "more restrictive formulations" that

Congress had employed (rather like the "aggrieved" person language here), *id.* at 164–65, 117 S.Ct. 1154, pointing to such statutes as the Clean Water Act, 33 U.S.C. § 1365(g) (defining "citizen" for purposes of the citizen-suit provision in § 1365(a) as "[any person] having an interest which is or may be adversely affected"), and the Ocean Thermal Energy Conversion Act, 42 U.S.C. § 9124(a) (providing that "any person having a valid legal interest which is or may be adversely affected may commence a civil action"). In addition, the *Bennett* Court noted that the subject matter of the ESA was the environment, "a matter in which it is common to think all persons have an interest," 520 U.S. at 165, 117 S.Ct. 1154; this cannot be said of the FPA, even if environmental concerns played a role in motivating Congress to enact some of its portions.

■ Petitioners argue that even if the statute imposes prudential standing requirements, the harms they allege clearly fall within the statute's zone-of-interests. The "zone" test is "not meant to be especially demanding," *Clarke v. Securities Indus. Assoc.*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); in fact, a plaintiff who is not itself the subject of the agency action is outside the zone of interests only if its interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* Petitioners rely on the Second Circuit's holding in *Scenic Hudson Preservation Conference v. Federal Power Commission*, 354 F.2d 608, 616 (2d Cir.1965), that "to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic, conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be included in the class of 'aggrieved' parties under § 313(b)." But the substantive authority exercised by the Commission and under review in *Scenic*

*Hudson* was quite different, and seemed to invite environmental considerations. It had promulgated an order licensing the construction of a pumped storage hydroelectric plant under FPA § 10, 16 U.S.C. § 803(a), which requires that to be approved a project must be "best adapted to a comprehensive plan for improving or developing a waterway or waterways" for uses including "interstate or foreign commerce" as well as "other beneficial public uses, including recreational purposes." The court interpreted "recreational purposes" to encompass "the conservation of natural resources, the maintenance of natural beauty, and the preservation of historic sites." *Scenic Hudson*, 354 F.2d at 614.

■ The order at issue in this case, however, merely allows H.Q. Energy to broker energy at market-based rather than cost-based rates. Although the Second Circuit found that environmental concerns motivated Congress in enacting the FPA, and are "undoubtedly" within the zone of interests protected when the agency acts to authorize construction, *id.*, the agency here acts only in its ratemaking capacity. And as the Supreme Court has said, "the meaning of the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question ..., but by reference to the particular provision of law upon which the plaintiff relies." *Bennett v. Spear,* 520 U.S. at 175–76, 117 S.Ct. 1154; see also *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) ("[T]he plaintiff must establish that the injury he complains of ... falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."). Congress's purposes in enacting the *overall* statutory scheme are relevant *only* insofar as they may help reveal its purpose in enacting the particular provision. See *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1074 (D.C.Cir.1998). We thus focus on the provision under which the Commission acted here, § 205(a) of the Federal Power Act, which controls the Commission in its exercise of ratemaking authority:

> All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable . . . .

16 U.S.C. § 824d(a).

■ In interpreting the statutory provision, "just and reasonable," the Supreme Court has emphasized that "the Commission [is] not bound to the use of any single formula or combination of formulae in determining rates." *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 88 L.Ed. 333 (1944). But the Court has articulated the interests that must be protected through such a determination: "[T]he fixing of 'just and reasonable' rates[ ] involves a balancing of the investor and the consumer interests." *Id.* at 603, 64 S.Ct. 281. Both interests are economic and tied directly to the transaction regulated: "the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated," *id.*, while there is a "consumer interest in being charged non-exploitative rates." *Jersey Central Power & Light Co. v. FERC,* 810 F.2d 1168, 1178 (D.C.Cir. 1987). Where (as here) the grant of ratemaking authority stems from congressional concern over market power (which justifies the agency's relaxing its grip when such power is absent), see, e.g., *Tejas Power Corp. v. FERC,* 908 F.2d 998, 1004 (D.C.Cir.1990) ("In a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that price is close to marginal cost, such that the seller makes only a normal return on its investment."), the object may be stated as to set "prices equal to those that the firm would set if it did

not have monopoly power; that is, to replicate a 'competitive price.'" Stephen G. Breyer, Richard B. Stewart, Cass R. Sunstein & Matthew L. Spitzer, *Administrative Law & Regulatory Policy* 228 (4th ed.1999). Unsurprisingly, the Supreme Court has never indicated that the discretion of an agency setting "just and reasonable" rates for sale of a simple, fungible product or service should, or even could, encompass considerations of environmental impact (except, of course, as the need to meet environmental requirements may affect the firm's costs).

Following the judicial lead, the Commission has affirmatively forsworn environmental considerations. In *PSI Energy, Inc.*, 55 FERC ¶ 61,254 (1991), it reviewed an interconnection agreement and rates to be charged thereunder. Certain petitioners raised various "siting, health, safety, environmental [and] archaeological problems" associated with the line through which the power would flow, but the Commission said that such factors were "beyond the Commission's authority to consider under sections 205 and 206 of the Federal Power Act." *Id.* at 61,811. "In a case such as this one, the Commission's authority is limited to review of the rates, terms and conditions of jurisdictional agreements to ensure that they are just and reasonable and not unduly discriminatory or preferential." *Id.*; see also *Monongahela Power Co.*, 39 FERC ¶ 61,350 at 62,096 (1987) ("Congress has not granted the Commission authority to reject rate filings on environmental grounds.").

■ The Commission's understanding of its duty under § 205(a) leads us toward a resolution of the zone-of-interests test. The test embraces interests "'arguably ... to be protected' by the statutory provision at issue," *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, ——, 118 S.Ct. 927, 935, 140 L.Ed.2d 1 (1998) (quoting *Data Processing*, 397 U.S. at 153, 90 S.Ct. 827), which in turn is inherently linked to the question of what interests the statute actually pro-

tects. Thus, if the Commission's view of § 205(a) is valid, it would appear that persons asserting interests excluded under that view could be "arguably" within the requisite zone only if those interests were so congruent with actually protected interests as to make their possessors "suitable challenger[s]" of the agency's purported exercise of its authority. *Mova Pharmaceutical Corp.*, 140 F.3d at 1075. Thus, the petitioners are outside the relevant zone of interests if (1) FERC's refusal to consider environmental issues under § 205(a) is valid, and (2) environmental interests are not "congruent" with the issues that are pertinent under § 205(a).

■ FERC's exclusion of environmental claims is valid. In the face of congressional silence we defer to an agency's reasonable interpretation of statutes it is charged with administering. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Although rates have environmental consequences (increases in the price of electricity, for instance, may at the margin lead to substitution of fuel oil), it seems pointless to weave such issues into setting "just and reasonable" rates for electric power. The environmental issues posed by construction and operation of energy facilities will invariably be reviewed under other provisions; if those reviews (or other forces such as liability risks or firm commitment to environmental quality) cause the utility to incur costs, such costs would feed into the Commission's normal rate calculation. See *Iroquois Gas Transmission System, L.P. v. FERC*, 145 F.3d 398 (D.C.Cir.1998) (remanding to the Commission for a finding whether utility's legal defense costs resulting from a federal investigation into environmental violations were "prudently incurred," and thus could be included within the rate base); cf. *NAACP v. Federal Power Commission*, 425 U.S. 662, 668, 96 S.Ct. 1806, 48 L.Ed.2d 284 (1976) (finding that the Federal Power Commission was authorized to exclude from rates those costs that result from discriminatory prac-

tices of regulatees, just like "any other illegal, duplicative, or unnecessary labor costs"). Beyond that, additional focus on environmental elements would seem to complicate an already complex process, with little or no offsetting benefit to the public. So, at least, FERC could reasonably decide.

Petitioners driven by environmental interests might still be "suitable challengers" if their interests were "congruent" with the pertinent interests. But ratemaking under § 205(a) is, as our cases have made clear, an effort to balance the interests of power consumers and producers. Environmental interests appear orthogonal to both. Thus litigation by persons whose interests are such is "more likely to frustrate than to further ... statutory objectives," *Mova Pharmaceutical Corp.*, 140 F.3d at 1075, and they are not the appropriate parties to "police the interests that the statute protects," *id.* Hence we find that the environmental interests of the petitioners are insufficient to afford them prudential standing to press their claims under § 205(a) of the FPA.[1]

For the Coalition, environmental impacts are not the sole basis for asserting claims that the Commission misapplied § 205(a). Its members, residents of New York and Vermont, are also power consumers. (The Coalition does not say that they buy power originating with H.Q. Energy or Hydro–Quebec, a possible deficiency in their Article III standing.) But the Coalition does *not* claim that FERC's Order will directly injure them as power buyers, as might be the case in the normal interstate transaction. Even *without* the marketing order Hydro–Quebec is entitled to sell into border states—as it concededly has been doing—without any subjection to FERC ratemaking. See Rehearing Order, 82 FERC at 61,898 n. 9. Rather, the

Coalition argues only that the Order will preempt state regulation of which its members have hitherto been beneficiaries. Vermont, for instance, currently subjects all significant wholesale purchases of out-of-state power by Vermont utilities to a prudency determination. See 30 Vt. Stat. Ann. tit. 30, § 248(a)(1) (1998).

■ The Coalition's fear that such state regulation would be preempted is unfounded. The Federal Power Act explicitly provides that state regulation of energy sold between a state and a foreign country is only preempted when it conflicts with the Commission's statutory requirements relating to the *export* of energy. See 16 U.S.C. § 824a(f). State regulation of imports does not present such a conflict, and therefore would not be preempted by the Order at issue here. Thus, this additional interest does not even constitute an "injury-in-fact," necessary for Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

\*    \*    \*

We now turn to petitioners' NEPA claim. Their alleged injury, once again, is to their environmental interests; the Commission's failure to perform an environmental assessment made its grant of the Order more probable, thus increasing the likelihood of their suffering the environmental injuries that they claim. See *Lujan*, 504 U.S. at 572–73 nn.7 & 8, 112 S.Ct. 2130. Once again we find that petitioners have not demonstrated prudential standing.

This of course turns on the purposes of the provision that petitioners invoke—NEPA's requirement that agencies include an environmental impact statement ("EIS") with every "major Federal ac-

---

**1.** We do not consider the further question whether environmental injuries experienced abroad by foreign nationals (e.g., the Crees) are ever within the zone of interests of federal statutes. Compare *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201 (5th Cir.1991) (finding

that Canadian workers, affected by the loss of sales due to the EPA's ban on asbestos, pursuant to the Toxic Substances Control Act, did not have standing to challenge the action because of the Act's "national emphasis").

tion[ ] significantly affecting the quality of the human environment." NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C). The requirement is said to serve at least two congressional purposes. First, it ensures that the agency will have access to "detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Second, it serves the "informational role" of assuring the public "that the agency 'has indeed considered environmental concerns in its decisionmaking process,'" *id.* (quoting *Baltimore Gas & Electric Co. v. NRDC,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983)) and, "perhaps more significantly, provid[ing] a springboard for public comment." *Id.*

■ Looked at broadly, the EIS requirement obviously seeks to protect environmental interests. *United States v. Students Challenging Regulatory Agency Procedures ("SCRAP"),* 412 U.S. 669, 686 n. 13, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Much as in the case at hand, petitioners in *SCRAP* challenged a ratemaking on the basis that the agency did not prepare an EIS, and the Court found prudential standing. *Id.* The case was decided, however, prior to several cases making clear that § 102(2)(C) is a purely procedural requirement that "does not impose substantive duties mandating particular results, but simply prescribes the necessary process for preventing uninformed—rather than unwise—agency action." *Robertson,* 490 U.S. at 333, 109 S.Ct. 1835; see also *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 228, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (holding that the agency merely had to "consider[ ] the environmental consequences of its decision" but that "NEPA requires no more"); *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

■ Because § 102(2)(C) does not impose any additional substantive requirements on FERC, but merely serves to ensure that FERC consider those environmental concerns that it is already authorized to consider, the zone-of-interests of the EIS requirement can be examined only in conjunction with the relevant substantive provision. Because we have decided that the Commission properly does not consider environmental concerns in the exercise of its ratemaking authority under FPA § 205, NEPA's procedural requirements (if they even apply to FERC's ratemaking decisions, which we do not decide) do not further petitioners' environmental interests in this instance. Accordingly, given the absence of any allegation by petitioners of an "informational injury," compare *FEC v. Akins,* 118 S.Ct. at 1786, they are not "suitable challengers" of FERC's failure to prepare an EIS. *Mova Pharmaceutical Corp.,* 140 F.3d at 1075. We thus find that the petitioners' environmental interests are not within § 102(2)(C)'s NEPA's zone-of-interests as applied to FPA § 205.

■ We stress that although our decision here has involved an interpretation of FPA § 205(a) and NEPA § 102(2)(C), we do not purport to decide the merits of the case—in particular petitioners' claim that FERC violated NEPA by refusing to perform an environmental assessment and, in the alternative, that even if FERC's regulation, 18 CFR § 380.4(a)(15) (1996), provides a valid categorical exclusion for all electric rate filings pursuant to FPA § 205, the agency cannot rely on this justification without having invoked it during the proceedings. To the extent that we have broached merits issues concomitant to resolving prudential standing, *Steel Co.* clearly contemplates that courts may do so even before resolving Article III standing. It explicitly notes that "a statutory standing question can be given priority over an Article III question," 118 S.Ct. at 1013–14 n. 2, and even justifies the occasional deciding of merits questions before statutory

standing questions on precisely the grounds that the two may overlap:

> The question whether *this* plaintiff has a cause of action under the statute, and the question whether *any* plaintiff has a cause of action under the statute are closely connected—indeed, depending upon the asserted basis for lack of statutory standing, they are sometimes identical, so that it would be exceedingly artificial to draw a distinction between the two.

*Id.* Unlike the "doctrine" or practice of "hypothetical jurisdiction," which *Steel Co.* emphatically rejected, such treatments of prudential standing do not carry a risk of plunging a court into issuing advisory opinions. *Id.* at 1016; see also *United States ex rel. Long v. SCS Business & Technical Institute, Inc.,* 173 F.3d 890, 896 (D.C.Cir.1999), *modifying,* 173 F.3d 870 (D.C.Cir.1999).

Accordingly, the petition is

*Dismissed.*